## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TARAH MCLAUGHLIN, <br> *individually, and as the* <br> *legal representative of the* <br> *ESTATE OF IAN MCLAUGHLIN, et al.,* <br><br> Plaintiffs, <br><br> v. <br><br> ISLAMIC REPUBLIC OF IRAN, <br><br> Defendant. | Civil Action No. 21-2834 (ABJ) |

## <u>MEMORANDUM OPINION</u>

This case arises out of the January 11, 2020 bombing attack by the Taliban and the Haqqani Network that killed two American soldiers and seriously injured two others near the Kandahar Airfield in Afghanistan. Compl. [Dk. # 1] at 4–5. Plaintiffs – the estates, surviving servicemen, and immediate family members of the four victims – have brought this action against The Islamic Republic of Iran under the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, alleging that Iran is liable for providing material support, resources, assistance, and direction to carry out this terrorist attack. *See* Compl. at 21–26. Iran has not appeared to defend its conduct on these claims, so plaintiffs have filed a Motion for Default Judgment. [Dk. # 23] ("Pls.' Mot.").[1] Plaintiffs' motion will be **GRANTED** with

---

[1] On December 28, 2022, plaintiffs sought entry of default against Iran, Affidavit for Default [Dkt. # 19], which was entered by the Clerk of the Court the next day. Clerk's Entry of Default [Dkt. # 21]. Because plaintiffs failed to take any action after that date, on March 3, 2023, the Court ordered plaintiffs to file notice with the Court by March 17 as to why the case should not be dismissed for want of prosecution. *See* Min. Order (Mar. 3, 2023). On March 17, 2023, plaintiffs

respect to liability, and the Court will determine the amount of damages owed once more information has been provided.

## BACKGROUND & STANDARDS FOR DEFAULT

On January 11, 2020, an improvised explosive device (IED) blast near the Kandahar Airfield in Afghanistan (the "Kandahar Attack") killed two American soldiers, and two others suffered serious injuries. Compl. ¶ 113. Plaintiffs allege that the Taliban and Haqqani Network are responsible for the Kandahar Attack, planning and executing it, with material support from Iran, as part of a series of terrorist attacks against American forces in Afghanistan. *See* Compl. ¶¶ 96–115. Material support includes both the provision of weaponry and tactical training on how to use it against American soldiers. *See* 28 U.S.C. 1605A(h)(3); *accord* 18 U.S.C. 2339A(b)(1).

The FSIA "establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts . . . [but] that grant of immunity is subject to a number of exceptions." *Mohammadi v. Islamic Repub. of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015). One of these, known as the "terrorism exception," provides that the statute does not afford protection to countries that provide material support to terrorist organizations. *See* 28 U.S.C. § 1605A. Plaintiffs sue under this exception. *See* Compl. ¶ 116–160.

Because Iran did not respond, plaintiffs have moved for default judgment. Before the Court can enter judgment, though, plaintiffs must establish that this Court has both subject matter jurisdiction over the dispute and personal jurisdiction over the defendant. *See Jerez v. Repub. of*

---

filed a Response to Order to Show Cause [Dkt. # 22], and on April 21, 2023, filed the instant motion for default judgment, *see* Pls.' Mot., along with six exhibits. *See* Exs. 1–6 to Pls.' Mot. [Dkt. ## 23-3].

*Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014).  Plaintiffs may establish both types of jurisdiction by properly pleading all elements of a claim under 28 U.S.C. § 1605A.  This means that plaintiffs must identify the terrorist group responsible for the attack and show that Iran provided material support or resources.

Plaintiffs have supplied the reports of two experts on Iran's history of providing material support and resources to the Taliban and Haqqani Network, as well as evidence that indicates the presence of that support the Kandahar Attack.  *See* Pls.' Mot. at 12.  In FSIA cases, expert testimony is often sufficient for plaintiffs to meet their burden because "firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Owens v. Repub. of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated and remanded sub nom. Opati v. Repub. of Sudan*, 590 U.S. 418 (2020).

Plaintiffs' first expert, Phillip Smyth, began his research on Iran's utilization of proxy groups in the Middle East in 2006.  *See* Expert Aff. of Phillip Smyth. [Dkt. # 23-3] ("Smyth Aff.") ¶ 1.  He has worked assessing such groups' organization, affairs, and relationships as a researcher at the University of Maryland and as a resident fellow at the Washington Institute for Near East Policy.  Smyth Aff. ¶¶ 3, 5–6.  He has given guest lectures at the National Defense University, as well as other American universities, testified before congressional committees about Iranian proxy growth and use in the Middle East, and briefed members of Congress on matters dealing with counterterrorism and Iran foreign policy since 2013.  Smyth Aff. ¶¶ 7–8, 11.  He has also given briefings to multiple departments within the executive branch of the United States government, organizations linked to NATO, and police and government agencies for various European and Middle Eastern governments.  Smyth Aff. ¶ 10.  Given his knowledge and experience, Smyth was qualified as an expert witness on the topics of "(1) the relationships

between Iran and the militia groups it has backed and (2) the explosive devices used in attacks by these groups" in *Fissler v. Islamic Republic of Iran*, No. 18-cv-3122, 2022 WL 4464873, at *2 (D.D.C. Sept. 26, 2022).

Plaintiffs' second expert, Donald Wade Barker, was a member of the United States army from 1995 until 2009 who lead counter-IED units in Iraq, Afghanistan, and the United States. *See* Expert Aff. of Donald Wade Barker. [Dkt. # 23-4] ("Barker Aff.") at 1, 9–11. Following his work with the Army, he served as a research scientist for five years at the Georgia Institute of Technology studying, assessing, and designing IED and counter-IED technologies, and he is currently serving as the Chief Executive Officer of the Tisdale Group, a company focused on producing defense technologies, including products that counter the impact and effectiveness of IEDs. Barker Aff. ¶¶ 3, 5. He was qualified as an expert on "[improvised explosive devices ("IEDs")], EFPs, and counter-IED technology" in *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 17 (D.D.C. 2019), and then on "IEDs, EFPs, and counter-IED technology" in *Roberts v. Islamic Republic of Iran*, 581 F. Supp. 3d 152, 159 (D.D.C. 2022), *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 482 (D.D.C. 2021), and *Stearns v. Islamic Republic of Iran*, 633 F. Supp. 3d 284, 291 (D.D.C. 2022).

Federal Rule of Evidence 201(b) permits courts to take judicial notice of facts that are "not subject to reasonable dispute" and that are "either (1) generally known within the territorial jurisdiction . . . or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see also Rimkus v. Islamic Repub. of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010) (noting courts can rely on evidence presented in earlier FSIA litigation to reach independent findings of fact). Therefore, when considering plaintiffs' submission, the Court will also take judicial notice of the aforementioned

prior cases in this district that have involved a claim under § 1605A against the Islamic Republic

of Iran. This is not to say that the Court will automatically accept all findings or assertions in prior

cases; it merely considers them relevant.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 55(a) provides that the Clerk of the Court must enter a

party's default "[w]hen a party against whom a judgment for affirmative relief is sought has failed

to plead or otherwise defend, and that failure is shown by affidavit or otherwise." Fed. R. Civ. P.

55(a). And under Federal Rule 55(b)(2), the Court may consider entering default judgment when

a party applies for that relief. See Fed. R. Civ. P. 55(b)(2). "[S]trong policies favor the resolution

of genuine disputes on their merits," and, therefore, "[t]he default judgment must normally be

viewed as available only when the adversary process has been halted because of an essentially

unresponsive party." *Jackson v. Beech*, 636 F.2d 831, 832, 836 (D.C. Cir. 1980), quoting *H. F.*

*Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)

(internal quotation omitted).

When a default judgment is sought under the FSIA, a claimant must "establish[ ] h[er]

claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). As the D.C.

Circuit has explained, "the statute has always authorized the courts to enter default judgments

against defendants who refuse to appear. With these provisions, Congress aimed to prevent state

sponsors of terrorism – entities particularly unlikely to submit to this country's laws – from

escaping liability for their sins." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d

1044, 1048 (D.C. Cir. 2014), citing 28 U.S.C. § 1608(e). But "the entry of a default judgment is

not automatic," *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted), and a court

must still be satisfied that it has subject matter jurisdiction over the action, *see Braun v. Islamic*

*Republic of Iran*, 228 F. Supp. 3d 64, 74 (D.D.C. 2017), as well as personal jurisdiction over the defendant.  *See Mwani*, 417 F.3d at 6.

## FINDINGS OF FACT

**I.     Iran's Support for Terrorism.**

**A. Iran's Designation as a State Sponsor of Terrorism.**

Iran has utilized terrorist proxy groups as an instrument of its foreign policy since the rise of the Islamic Republic.  Smyth Aff. ¶ 14.  After the Iranian revolution in 1979, the new Supreme Leader Ayatollah Khomeini created the Islamic Revolutionary Guard Corps (IRGC).  *See Karcher*, 396 F. Supp. 3d at 22.  The IRGC helped Khomeini install a theocratic Islamic government in Iran. *See id.*  It created the Quds Force (IRGC-QF) and tasked it with overseeing international operations, including training many other terrorist groups on insurgency and terrorism.  *See id.* The U.S. State Department has formally designated the both the IRGC and the IRGC-QF as foreign terrorist organizations.  Compl. ¶¶ 31, 34.

Smyth explains that, while Iran's ultimate goal is to "create a Shia Islamist government with all of Islam under its belt," it is "highly pragmatic," forming relationships with terrorist groups of various, and even opposing, ideological standpoints so as to "benefit from second order effects that negatively impact its main foes."  Smyth Aff. ¶¶ 16–21.  As a result of Iran's support for acts of international terrorism, the United States designated Iran as a state sponsor of terrorism on January 19, 1984, and the designation remains in place today.  *Karcher*, 396 F. Supp. 3d at 22.[2]

**B. Iran's Relationship with the Taliban and Haqqani Network.**

---

[2]    *See also State Sponsors of Terrorism*, U.S. Dep't of State, https://www.state.gov/j/ct/list/c14151.htm (last visited Feb. 6, 2025).

According to plaintiff's expert, "Iran has actively asserted that its main enemy in the world is the United States," and it has "employed a vast array of proxy groups and allies," like the Taliban, to support it in its opposition to the United States.  Smyth Aff. ¶¶ 18–19.  Since the American invasion of Afghanistan in 2001, the Taliban's main goal was to "expel foreign forces from Afghanistan" and "regain its authority over the country," which it primarily sought to achieve through the "planning, support, and execution of terrorist attacks against American personnel and interests."  Compl. ¶ 39.

Although Iran espouses an "ideological opposition" to the Taliban and supports the group's adversaries, plaintiff's expert considers Iran's support of the Taliban (and its interlinked Haqqani Network) a "perfect" example of its overall proxy group utilization strategy to target American personnel and interests.  *See* Smyth Aff. ¶¶ 17, 20–21, 62.  Iran has been engaged in a continuing joint effort to expel the United States from Afghanistan.  *Id.* ¶ 24.

Smyth states that "[i]n combat theaters like Afghanistan, Iran uses political and military trends that dovetail with economic hardships to craft individuals more inclined to commit violent acts."  *Id.* ¶ 38.  Iran's funding of groups like the Taliban leads to increased "power," "operational capabilities," "extreme anti-American positions" and, accordingly, "an eagerness to attack U.S. interests."  *Id.* ¶¶ 38, 40.  By 2005, there existed "a direct Iranian cash pipeline" that paid the Taliban "$1,700 for each killed Afghan soldier and $3,500 for an Afghan official."  *Id.* ¶ 41.  In 2010, it was further reported that the Taliban received "$1,000 per killed U.S. serviceman and $6,000 for each destroyed U.S. vehicle."  *Id.*  Starting in 2006, Iran also utilized Abdullah Samad Faroqui, the Taliban's "shadow governor" of Afghanistan's Herat Province, to distribute funds directly to fighters' families.  *Id.*

To further increase its influence in Afghanistan, and "battle the United States as its primary and ultimate foe," Iran supplies the Taliban with military support and resources.  *See id.* ¶¶ 22–27. This has included both Iran's "assisting the Taliban with training bases in Iran" and "arms transfers to the Taliban from Iran."  *See* Compl. ¶¶ 67–82; Smyth Aff. ¶¶ 23, 51.  Since 2006, the U.S. State Department has determined that the "Iranian military has provided the Taliban with training on small unit tactics, small arms, explosives, and indirect fire weapons, such as mortars, artillery, and rockets," and that it has shipped "a large number of weapons to Kandahar Afghanistan."  Smyth Aff. ¶ 23, quoting U.S. Dep't of State, Country Reports on Terrorism 2012, 196 (2013).  Further, in 2010, the American and NATO military commander in Afghanistan, Stanley McChrystal, observed that the "training that we have seen occurs inside Iran" and "weapons that we have received come from Iran into Afghanistan."  *Id.* ¶ 22.

By July 2012, Iran had allowed the Taliban to open an office in Zahedan, Iran, and, by 2014, another office in Mashhad, Iran.  Compl. ¶¶ 78, 80.  In 2014, IRGC-QF officers were implicated by the United States for providing "logistical support" in the planning and execution of terrorist attacks against Americans in Afghanistan.  Smyth Aff. ¶ 36.  Following the withdrawal of U.S. troops from Afghanistan at the end of this same year, Iranian support and direct coordination with the Taliban only strengthened.  *Id.* ¶ 25.   In 2016, the leader of the Taliban was killed in a drone strike while on a visit to the country to fulfill "ongoing battle obligations."  *Id.* Further, in 2018, the U.S. Department of the Treasury reported that Iranian officials agreed to provide Ibrahim Sadr, the former Taliban Military Commission Chief, with "monetary support and individualized training in order to prevent a possible tracing back to Iran. Iranian trainers would help build Taliban tactical and combat capabilities."  *Id.* ¶ 26, quoting Press Release, U.S. Dep't of Treasury, Treasury and the Terrorist Financing Targeting Center Partners Sanction Taliban

Facilitators and their Iranian Supporters (Oct. 23, 2018), https://home.treasury.gov/news/press-releases/sm532.

Leading up to the Kandahar Attack, Iran's support of Afghanistan extended into numerous factions linked with the Taliban and Haqqani Network, allowing it to maintain "continued influence in the region as a whole." *See* Smyth Aff. ¶¶ 26–28.

## II.    The Attack Against Plaintiffs.

A week before the Kandahar Attack, on January 3, 2020, a U.S. drone strike in Iraq killed Qasem Soleimani, the head of IRGC-QF and a high-ranking Iranian general, as well as a Specially Designated Global Terrorist under President Obama's administration. *Id.* ¶¶ 43–44. Iran's Supreme Leader Ayatollah Khamenei vowed "severe revenge" in response, and, on January 7, Iran announced a series of forthcoming violent actions against the United States to "avenge Soleimani's death." *Id.* ¶ 45. The next day, Iranian forces promptly launched ballistic missiles at an American base near Erbil, Iraq and at Ain al-Assad Airbase in central Iraq. *Id.* ¶ 46. Calls for vengeance were also immediately issued by Iranian proxy groups. *Id.* ¶ 47.

On January 11, 2020 at 7:34 AM, Army Staff Sergeant Ian McLaughlin, Private First Class ("PFC") Miguel Villalon, and servicemen Jonathon Bueno and Laban Underwood were conducting a route clearance patrol in a Mine Resistant Ambush Protected ("MRAP") vehicle 12 kilometers southwest of the Kandahar Airfield in Afghanistan. Compl. ¶¶ 19–20. Staff Sergeant McLaughlin, the commander of the second vehicle in the convoy, was sitting in the front with PFC Villalon, who was driving the vehicle; Bueno, the gunner, was in the row behind them, along with Underwood, who was tasked with looking through the window and scanning for certain risks. Pls.' Mot at 7–8; Aff. of Jonathon Bueno, Ex. 5 to Pls.' Mot. [Dkt. # 23-7] ¶ 11; Underwood Aff. ¶¶ 5–6. The "direction of travel shows that the vehicle took a hard left off-road" before circling

back around and driving "directly over" a pressure-plate-activated device. Baker Aff. ¶ 12. The blast breached the vehicle's hull, separating it from the engine compartment and flipping the fifteen-ton vehicle upside down. Compl. ¶ 21; Bueno Aff. ¶¶ 10, 12; Underwood Aff. ¶ 7.

The attack killed McLaughlin and Villalon instantly. *See* Compl. ¶¶ 21,. According to plaintiffs' IED expert, the "unusual point of attack" is indicative of a high level of sophistication and external support. Baker Aff. ¶ 12. Bueno and Underwood woke up upside down and were both stuck, but they managed to crawl out and were later transported to the Kandahar Airfield Hospital via medical evacuation helicopters for treatment. Bueno Aff. ¶¶ 13–14, 16; Underwood Aff. ¶¶ 8–9.

Buenos's wounds required surgery; he "had shrapnel in [his] elbow, right leg, and lots of bruises and cuts all over [his] body. The Attack also broke [his] left leg, tore ligaments in [his] ankle, and injured his knee." Bueno Aff. ¶ 17. He was "flown to Germany the next day, where [his] wounds required a second surgery and implantation of two metal rods in [his] leg." Bueno Aff. ¶ 18. He ultimately "ended up in the Intensive Care Unit" with a "C-2 level neck fracture, which required surgery," and he also suffered "a suspected arterial dissection" and "a traumatic brain injury." Bueno Aff. ¶ 18. He still suffers from "pain in [his] knee and neck," "the effects of the traumatic brain injury," as well as "persistent mood swings, insomnia, and other symptoms." Bueno Aff. ¶ 20. Underwood was "diagnosed with a major [traumatic brain injury], had memory loss, [] was unable to walk steadily, had difficulty holding down food, and [had] trouble speaking clearly." Underwood Aff. ¶ 11. He also "sustained a cut on [his] shin" from the MRAP debris, and "later had surgery on [his] right ankle to repair ligaments torn in the explosion." Underwood Aff. ¶ 11.

Plaintiff's expert has opined that both "specific intelligence well in advance of the mission" and "a highly organized effort" were necessary to quickly and secretly carry out such a significant attack. Baker Aff. ¶ 12. The circumstances of the attack, including the explosive material used, as well as the sheer size and sophisticated nature of the bomb, are "wholly consistent with an IRGC-sponsored act of retaliation for the death of Qassem Soleimani" with the goal "of targeting American servicemen in Afghanistan." *See id.* ¶¶ 13, 21–24.

The size of the crater and damage to the MRAP vehicle indicate that a significant amount of explosives was used. Baker Aff. ¶ 13. Yet individuals who investigated the scene reported that a "lack of explosive residue on the trucks pointed to Iranian origin of explosive materials, consistent with the intelligence of explosive materials being smuggled into the area." Bueno Aff. ¶ 15. According to Baker, the size of the explosion coupled with the lack of residue indicates the use of high-energy military-grade explosives, which the Taliban could not access easily in Afghanistan and would most likely have been secured from Iran. Baker Aff. ¶ 15.

In addition to the explosive material, the nature of the bomb and its triggering mechanism point to Iran's involvement in the Attack. Baker Aff. ¶ 13. The MRAP vehicle was equipped with an adjustable mine roller, a countermeasure designed to impede the ability for those "planning the detonation to correctly calculate for the offset between initiation of the triggering mechanism and the body of the vehicle being targeted." *Id.* ¶ 13. Nevertheless, in the Attack, those laying the explosives were only off by a few inches in their calculations from what would have been a perfect hit of the driver compartment. *Id.* ¶ 14. This accuracy required sophisticated engineering knowledge and inside information about the vehicle and the adjusted length of its mine roll, which is "beyond the tactical capabilities of the Taliban without the active assistance of a state sponsor." *Id.*

Plaintiffs' expert also explains that the position and precision of the blast is consistent with the explosive being a VOIED ("Victim Operated Improvised Explosive Device"). *Id.* ¶ 13. A VOIED dual trigger system does not require a "triggerman" to detonate it. *Id.* ¶ 18. The device, initiator, and trigger may be planted in advance, and "when the time is right," a wireless device can "turn on" the trigger so that the next vehicle that drives over the device causes it to detonate. *Id.* The location of the explosion was off a "beaten path and not on an establish roadway," which would be consistent with the use of a dual initiation source. *Id.* ¶ 17. Such a device and set up requires extensive electrical engineering capabilities likely exceeding those of the Taliban and thus requiring the active assistance of a state sponsor. *Id.* To transport and bury a device of this size to the specific location off the main roadway, both "an effective transport network and high confidence in accurate intelligence" that the target would pass over it were necessary. *Id.* ¶¶ 19–20. This likely came from an external institutional sponsor which, based on the specific region of Kandahar, would have been Iran. *Id.* ¶ 20.

## ANALYSIS

### I.    Subject Matter Jurisdiction

28 U.S.C. § 1330 directs that unless a foreign state has immunity under sections 1605–07 of the same title or pursuant to an international agreement, a district court has "original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state[.]" 28 U.S.C. § 1330(a). The FSIA creates an exception to sovereign immunity for acts of terrorism, which provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). For a court to hear a claim brought under section 1605A, it must also find that, at the time of the act, "the foreign state was designated a state sponsor of terrorism" and that "either a victim of the act or the claimant in the suit was an American national." *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1058 (D.C. Cir. 2024) (internal quotations omitted), citing 28 U.S.C. § 1605A(a)(2)(A)(i)(I) and (ii).[3]

Plaintiffs satisfy these initial hurdles. "Iran has been designated a state sponsor of terrorism since 1984," so plaintiffs meet the first criterion, *Mohammadi*, 782 F.3d at 14, and, given their nationalities, plaintiffs also satisfied the second:

- Plaintiff Tarah McLaughlin is a citizen of the United States who is the personal representative of the Estate of Ian McLaughlin and the widow of Ian McLaughlin, who was also an American citizen. Aff. of Tarah McLaughlin. [Dkt. # 23-5] ("McLaughlin Aff.") ¶¶ 1–2. Tarah and Ian had three children together, M.M., E.M., and I.M., who are all American citizens. *Id.* ¶ 4.

- Plaintiff Olivia Villalon is a citizen of the United States who is the personal representative of the Estate of Miguel Villalon and the mother of Miguel Villalon, who was also an American citizen. Aff. of Olivia Villalon [Dkt. # 23-6] ("Villalon Aff.") ¶¶ 1–3. Plaintiffs Arnoldo Fernandez and Antonio Fernandez are the half-brothers of Miguel and are both American citizens. *Id.* ¶ 4.

---

3       The exception also requires a court to find that "if 'the act occurred in the foreign state against which the claim has been brought,' the claimant gave the foreign state a 'reasonable opportunity' to arbitrate prior to filing a lawsuit." *Borochov*, 94 F.4th at 1058, citing 28 U.S.C. § 1605A(a)(2)(A)(iii). Because the attack at issue in this case took place in Afghanistan, not Iran, this requirement does not apply. *See Thole v. Islamic Republic of Iran*, No. CV 23-793, 2024 WL 2208208, at *12, n.10 (D.D.C. May 16, 2024) (finding "reasonable opportunity to arbitrate" requirement inapplicable where attack took place in Saudia Arabia, but FSIA claim was brought against Iran).

- Plaintiff Jonathon Bueno is a citizen of the United States. Aff. of Jonathon Bueno [Dkt. # 23-7] ("Bueno Aff.") ¶ 1. Plaintiff Krystal Bueno is the wife of Jonathon and the two were married at the time of his deployment. Bueno Aff. ¶ 4. J.B. and S.B. are the natural born children of Jonathon, and M.L. is Krystal's son and Jonathon's stepson, who "in all respects [was] the functional equivalent of [a] natural born son." *Id.* ¶¶ 5–6. Krystal, J.B., S.B., and M.L. are all citizens of the United States. *Id.* ¶ 7.

- Plaintiff Laban Underwood is a citizen of the United States. Aff. of Laban Underwood. [Dkt. # 23-8] ("Underwood Aff.") ¶ 1.

Plaintiffs have also properly stated a claim for relief under § 1605A(a)(1), that is, they have adequately plead: "[1] money damages sought [2] for personal injury or death [3] that was caused by [4] an act of . . . extrajudicial killing . . . or the provision of material support or resources for such an act if such act or provision of material support or resources [5] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1).

Collectively, plaintiffs seek monetary damages for direct and derivative injuries arising from the deaths of Staff Sergeant McLaughlin and PFC Villalon, and physical injuries to servicemen Bueno and Underwood, *see* Compl. ¶¶ 116–160, and they have sufficiently plead that defendant The Islamic Republic of Iran "caused" the attack that led to their injuries.

Claims brought under the FSIA do not require "but-for" causation. *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 42 (D.D.C. 2009). In interpreting a provision under the FSIA, the D.C. Circuit found the causation element "to require only a showing of proximate cause." *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004), citing *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536–38 (1995). "Proximate cause exists so long as there is some 'reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.'" *Brewer*

*v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009), quoting *Kilburn*, 376 F.3d at 1128–29.

In this case, plaintiffs have submitted declarations from individuals with expert knowledge of Iran's support for the Taliban and the Haqqani Network. *See generally* Smyth Aff.; Barker Aff. They aver based on their expertise, and considering the timing, nature, location, and logistics of the attack, that the attack was part of Iran's retaliation through its proxies for a U.S. airstrike against a high-ranking Iranian General named as a specially designated global terrorist under the Obama's Administration. Baker Aff. ¶¶ 21, 23–24, Smyth Aff. ¶ 43. Indeed, "[t]here is no reasonable explanation of the facts other than that [the Taliban and Haqqani Network] were responsible for [the] bombing with direct assistance from Iran. Smyth Aff. ¶ 64. The Court therefore finds that plaintiffs have sufficiently alleged causation and injury. *See Valore v Islamic Republic of Iran*, 700 F. Supp. 2d 52,66 (D.D.C. 2010) ("The FSIA does not restrict the personal injury or death element to injury or death suffered directly by the claimant; instead, such injury or death must merely be the bases of a claim for which money damages are sought.").

Because plaintiffs have adequately demonstrated that the terrorism exception to the FSIA applies, defendant is not entitled to sovereign immunity, and this Court has subject matter jurisdiction over the case.

## II.    Personal Jurisdiction

28 U.S.C. § 1330(b) governs personal jurisdiction over foreign states. 28 U.S.C. § 1330(b) ("Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of this title."); *see Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015) ("[T]o sue a

foreign state . . ., a plaintiff must effect service in compliance with the Foreign Sovereign Immunities Act.").

28 U.S.C. § 1608 governs service of process and provides "four methods of service in descending order of preference," *Barot*, 785 F.3d at 27, and the D.C. Circuit requires "strict adherence to the terms of [the Act]." *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994). Under the FSIA:

> (a) Service in the courts of the United States and of the States shall be made upon a foreign state or political subdivision of a foreign state:
>
> > (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
> >
> > (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
> >
> > (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned; or
> >
> > (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services – and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a). To comply with section 1608, "a plaintiff must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on."

*Angellino v. Royal Family Al-Saud*, 688 F.3d 771, 773 (D.C. Cir. 2012), quoting *Ben–Rafael v. Islamic Republic of Iran,* 540 F.Supp.2d 39, 52 (D.D.C.2008) (internal quotation omitted).

Here, service under sections 1608(a)(1) and (a)(2) was not possible. Plaintiffs had no special arrangement with Iran, so they were not required to comply with section 1608(a)(1), and because Iran has failed to join any relevant international conventions, section 1608(a)(2) was also not an option. *See Levinson v. Islamic Republic of Iran*, 443 F. Supp. 3d 158, 175 (D.D.C. 2020) ("Because Iran does not have a special arrangement for service with the [claimants], nor is it a party to an international convention on service, the [claimants] did not need to attempt service in accordance with §[§] 1608(a)(1) or (a)(2)."); *see also Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 88 (D.D.C. 2018); *Ben-Rafael* 540 F. Supp. 2d at 52. Thus, the most preferable service option available to plaintiffs was section 1608(a)(3).

A.    **Service Under § 1608(a)(3).**

Section 1608(a)(3) has five elements, all of which have been satisfied through plaintiff's efforts. A plaintiff must (1) send "a copy of the summons and complaint and a notice of suit," (2) "together with a translation of each into the official language of the foreign state," (here, Farsi) (3) "by any form of mail requiring a signed receipt," (4) "to be addressed and dispatched by the clerk of the court" (5) "to the head of the ministry of foreign affairs of the foreign state concerned" (here, Mohammad Javad Zarif). *See* 28 U.S.C. § 1608(a)(3).

Plaintiffs filed their complaint in this Court on October 26, 2021. *See* Compl. It consists of four counts, all private rights of action under the FSIA against Iran pursuant to 28 U.S.C. § 1605A(c). *See* Compl. ¶¶ 116–160. On January 18, 2022, plaintiffs filed an affidavit seeking to effectuate service by requesting the Clerk of the Court's assistance in mailing the notice of suit, summons, complaint, and related documents to the Islamic Republic of Iran in Tehran, Iran, along

with copies of those pleadings in the official language of the foreign state, pursuant to 28 U.S.C. § 1608(a)(3).  Aff. Requesting Foreign Mailing [Dkt. # 7].  On January 20, 2022, the Clerk of the Court docketed a notice that it "is unable to effect service via the U.S. Post Office."  Notice of Clerk [Dkt. # 8].  On February 24, 2022, plaintiffs filed a notice explaining that service to the Islamic Republic of Iran had failed pursuant to 28 U.S.C. § 1608(a)(3) because counsel had "learned that shipping companies DHL, UPS, and Fed-Ex no longer ship packages from the United States of America to Iran," so their unsuccessful attempt via registered mail with the United States Postal Service was their "only available avenue" in effecting service.  Notice of Failed Service by Mailing. [Dkt. # 9].

### B.    Service Under § 1608(a)(4)

"[I]f service cannot be made within 30 days under paragraph (3)," a plaintiff must effectuate service under section 1608(a)(4).  28 U.S.C. § 1608(a)(4).  That section has seven elements that must be satisfied.  A plaintiff must (1) send "two copies of the summons and complaint and a notice of suit," (2) "together with a translation of each into the official language of the foreign state" (here, Farsi), (3) "by any form of mailing requiring a signed receipt," (4) "to be addressed and dispatched by the clerk of the court" (5) "to the Secretary of State in Washington, District of Columbia," (6) "and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state" (7) "and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted."  *Id.*

On February 25, 2022, thirty-eight days after plaintiffs attempted serviced under section 1608(a)(3), plaintiffs "request[ed] that the Clerk mail a copy of the summons and complaint" to Iran, "pursuant to the provisions of ... 28 U.S.C. § 1608(a)(4)."  Affidavit Requesting Foreign Mailing [Dkt. # 10].  On March 1, 2022, the Clerk sent via FedEx "[t]wo copies of the summons,

complaint[,] and notice of suit, together with a translation of each into [Farsi]" to the Director of Overseas Citizens Services at the U.S. Department of State."  Certificate of Clerk [Dkt. # 12]. These steps satisfied elements one through five. See 28 U.S.C. § 1608(a)(4).

On October 31, 2022, plaintiffs filed the supplemental service documents.  Attach. 1 to Return of Service Affidavit. [Dkt. # 16] ("Embassy Service Docs.").  They reveal that the U.S. Embassy in Bern, Switzerland, sent a Diplomatic Note to the Swiss Ministry of Foreign Affairs on August 31, 2022, requesting judicial assistance from the Embassy of Switzerland in Tehran to effect service of the summons.  Embassy Service Docs. at 4–5.  On October 27, 2022, the Clerk of the Court received a letter from Jared N. Hess, an Attorney Adviser at the United States Department of State, Overseas Citizens Services Office of Legal Affairs, stating:

> Because the United States does not maintain diplomatic relations with the Government of Iran, the Department of State is assisted by the Foreign Interests Section of the Embassy of Switzerland in Tehran in delivering these documents to the Iranian Ministry of Foreign Affairs. These documents were delivered to the Iranian Ministry of Foreign Affairs under cover of diplomatic note No. 1100-IE, dated September 18, 2022 and delivered on September 26, 2022.

Return of Service Affidavit at 1.  The submission included a copy of the authenticated certificate of service.  *Id.* at 3.

Plaintiffs also attached additional documents showing proof of service by the Swiss Federal Department of Foreign Affairs on the Islamic Republic of Iran.  *See id.*  The Swiss Federal Department stated in a letter that it transmitted the documents to the Iranian Ministry of Foreign affairs on October 5, 2022, and "[t]he reception of the mentioned documents was refused the same day by the Iranian Ministry of Foreign Affairs."  Embassy Service Docs. at 7.

Since the record reflects that the documents were in fact delivered, it is of no moment that Iran refused to accept them, see *Levinson*, 443 F. Supp. 3d at 175; *Fritz*, 320 F. Supp. 3d at 89;

*Ben-Rafael*, 540 F. Supp. 2d at 52, and the record shows that as of October 31, 2022, plaintiffs had fully complied with the requirements of 28 U.S.C. § 1608(a)(4) and properly served Iran under the FSIA.

### III.   Plaintiffs Have Established Liability.

Finally, the court must determine whether Iran is liable for Plaintiffs' injuries.  Plaintiffs bring their claims under 28 U.S.C. § 1605A(c), *see* Compl. ¶¶ 116–160, and the Court must determine whether Iran is liable for the Kandahar Attack.  Section 1605A(c) provides that "[a] foreign state that is or was a state sponsor of terrorism" and any of its agents are liable "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages." 28 U.S.C. § 1605A(c).  Recovery of this provision is limited, to U.S. nationals, members of the armed forces, employees or contractors of the U.S. government, and legal representatives of any of those individuals.  *See id.*

"There is almost total 'overlap between the elements of § 1605A(c)'s cause of action and the terrorism exception to foreign sovereign immunity,' and a plaintiff that offers proof sufficient to establish a waiver of sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of law."  *Salzman*, 2019 WL 4673761, at *15 (cleaned up), quoting *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017)); *see also Karcher*, 396 F. Supp. 3d at 59; *Allan v. Islamic Republic of Iran*, No. 17-cv-338, 2019 WL 2185037, at *6 (D.D.C. May 21, 2019); *Fritz*, 320 F. Supp. 3d at 86–87.  The court has already concluded that plaintiffs are all U.S. nationals or members of the armed forces and that it has subject matter jurisdiction over plaintiffs' claims under the terrorism exception.  Accordingly, the court also concludes that Iran is liable for plaintiffs' injuries under 28 U.S.C. § 1605A(c).

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that plaintiffs' motion for default judgment [Dkt. # 23] is **GRANTED** with respect to liability.

However, "[t]o obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain' (i.e., more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit]'s application of the American rule on damages." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015), quoting *Salazar v. Islamic Republic of Iran,* 370 F.Supp.2d 105, 115–16 (D.D.C. 2005).   It is therefore **FURTHER ORDERED** that plaintiffs must file a motion setting forth their theory of damages, supported with declarations and other evidence that would enable the Court to make the necessary findings of fact regarding the nature of plaintiffs' injuries, by April 1, 2025.

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE: February 6, 2025